at Bath; thence over the Erie Railroad, a connecting line, to Jersey City. The hay was delivered by the defendant at Bath to the Erie Railroad, and while the hay was in transit over the Erie Railroad it was taken from its possession, and delivered to one Freeman, under a judgment in his favor in an action of replevin.

The liability of the defendant depends upon the terms of the bill of lading, which, in so far as they are material to the issues here, are as follows:

"Received from A. Jackson (the consignor) by the Bath and Hammondsport Railroad Co., the property described below   *   *   *   consigned and destined as indicated below, which said company agrees to carry to the said destination, if on its road, otherwise to deliver to another carrier on the route to said destination.

"It is mutually agreed, as to each carrier and as to each party interested in said property, that every service to be performed hereunder shall be subject to all conditions whether printed or written herein or endorsed hereon, and which are hereby agreed to by the shipper and by him accepted for himself and his assigns as just and reasonable:

"Consignees and Destination.

"To order A. Jackson.
"Notify Am. Hay Co., Long Dock, J. C.
"Via Bath, N. Y. and Erie R. R.
"Articles—Baled Hay.

"No carrier shall be liable for loss or damages not occurring on its own road, or its portion of the through route, nor after said property is ready for delivery to the next carrier or consignee.

"The amount of loss or damage for which any carrier becomes liable shall be computed at the value of the property at the place and time of shipment."

This bill of lading was delivered by the defendant to the shipper Jackson, and was accepted by him, and then by him transferred to the plaintiff. Under the terms of this bill of lading the defendant is not liable. It was in no way responsible for the failure of the Erie Railroad, the connecting line, to deliver the hay. Robinson v. N. Y. & Texas Steamship Co., 63 App. Div. 211, 71 N. Y. Supp. 424.

The judgment appealed from should be reversed, and a new trial ordered, with costs to appellant to abide the event. All concur.

---

### RICHARDSON v. AMSDON et al.

(Supreme Court, Special Term, Ulster County. July, 1903.)

1. ALIENS—ESCHEAT—NONRESIDENT CLAIMANT—BURDEN OF PROOF.
 Laws 1845, p. 95, c. 115, § 4, as amended by Laws 1874, p. 317, c. 261, and Laws 1875, p. 32, c. 38, provides, in effect, that an alien answering the description of heir of a deceased resident alien may take, as an heir, property situated in the state. *Held*, that where plaintiff in partition founds his claim on the theory that he answers to the description of an heir of a deceased resident alien, leaving property in the state of New York, the burden is on him to show that deceased was a resident alien.

2. SAME—NATURALIZATION—EVIDENCE.
 On an issue whether one born abroad had become a citizen of the United States by naturalization, it appeared that he had declared under oath in the Marine Court of the city of New York in 1835 his intention to become a citizen, and at the foot of the "first papers" issued to him was a note in his handwriting to the effect that he might take up his

citizenship or not.  It appeared that in 1836 he filed with the Secretary of State an oath of intention to reside in the United States and to become a citizen.  There was no record in the Marine Court of the taking out of final papers, and the first papers remained in his possession.  It was shown that it was not the practice of the Marine Court to require the surrender of the first papers.  *Held*, that no presumption that the naturalization was not completed arose from the fact that there was no record of the final papers, and that the first ones were not on file.

3. SAME—BURDEN OF PROOF.

The burden of proving naturalization could not be sustained by such negative evidence.

4. SAME—EVIDENCE—PROBATIVE FORCE.

An affidavit attached to a deposition, wherein deponent stated that an alien "took up his citizenship in the United States," was of no probative force in establishing the naturalization of the alien.

5. SAME.

The fact that an alien assumed to make leases and perform other acts which only a citizen might do was of no probative force in establishing his naturalization.

6. ALIENS—RESIDENT.

Laws 1845, p. 95, c. 115, § 4, as amended by Laws 1874, p. 317, c. 261, and Laws 1875, p. 32, c. 38, provides, in effect, that an alien answering the description of heir of a deceased resident alien may take, as heir, property situated in the state.  On an issue whether a foreign-born woman was at the time of her death a resident alien, within the statute, it appeared that she was born and lived in England until her marriage to a native of England, when she accompanied her husband to the state of New York; that they lived there until his death, when she returned to England with her two children, and lived there the balance of her life —more than 50 years.  In an affidavit verified by her after her return to England, she was described as temporarily residing in Fairmount, England, and certain deeds and mortgages by her, described her in the preliminary part as of the city and state of New York, temporarily residing in Fairmount, England, and in one she was described as "at present residing in England."  In her will and codicils she was described as "late of Fairmount, but now of * * * in the county of Surrey."  A witness testified that at an interview in England the woman said that she would "rather come back here and live, if it were not for fear of crossing the ocean"; that she was known in England as the "American Lady," and preferred to be regarded as an American.  *Held*, that the woman was not a resident alien, within the statute.

7. SAME—ESCHEAT.

Though an alien may take property devised from native-born children, on his death the amount is escheated to the state without inquest of office.

8. SAME—STATUTE EFFECTING DEVISE—PERPETUITIES.

Laws 1894, p. 342, c. 182, releasing all title acquired by the state by escheat to the property of an alien, and confirming the same in his testamentary trustees, is valid, notwithstanding the provisions of the will are contrary to the general rule limiting the right to suspend the alienation of property.

Partition by Emma Shaw Richardson against Elizabeth Shaw Amsdon and others.  Decree for defendants.

The following is the opinion of Referee Wilbur Larremore:

This is an action for the partition of real estate.  The principal facts upon which the plaintiff bases the right which she asserts are as follows: The property in question was conveyed to one James Dean, a native of England, who died, without having conveyed the same, in the city of New York, in the year 1843.  He left a will proven in the office of the surrogate of the county of New York in May, 1843, by which, after making certain pro-

visions for his widow, Elizabeth Dean, he devised all his real and personal property to his children, Frank Dean and Alice Dean, both native-born citizens of the United States. And here it may be said that any uncertainty of title in Frank Dean and Alice Dean that might have arisen from their father's equivocal status as to citizenship, hereafter discussed, would seem to have been set at rest by Laws 1845, p. 96, c. 115, § 9. Frank Dean died leaving a will recorded in the office of the surrogate of New York county, by which he gave and bequeathed all his real, personal, and leasehold properties to his mother, the said Elizabeth Dean. Alice Dean died leaving a will by which she devised and bequeathed all her estate, of whatsoever nature and kind, to her mother, the said Elizabeth Dean. Elizabeth Dean died November 22, 1891, leaving a will with two codicils thereto, which instruments were executed and have been proved in England, and a proceeding is now pending to prove the same in the county of New York.

The plaintiff contends that the will and codicils of Elizabeth Dean are void under the laws of the state of New York, because they would unlawfully suspend the power of alienation of property constituting her estate; that Elizabeth Dean was either a citizen or a resident alien; and that, therefore, under the provisions of section 4 of chapter 115, p. 95, Laws 1845, as amended by chapter 261, p. 317, Laws 1874, and chapter 38, p. 32, Laws 1875, in force at the time of her death, plaintiff and certain defendants, though aliens, as being the only persons who, according to the statutes of this state, would answer the description of heirs of the decedent, are entitled to take her real estate.

An act of the Legislature, which hereafter will be particularly referred to, has been passed, assuming and purporting to validate the testamentary trusts created by Elizabeth Dean. Obviously the burden of proof is on plaintiff to establish her cause of action.

Plaintiff contends, in the first place, that Elizabeth Dean became a citizen of the United States, not through personal naturalization, but through the alleged naturalization of her husband. The facts in support of this contention are substantially as follows: On the 15th day of December, 1835, James Dean declared, under oath, in the Marine Court of the city of New York, his intention to become a citizen, as appeared by an original certificate, or "first papers," to that effect issued to him, and which is now in existence, and was produced from the papers of Elizabeth Dean. On the foot of such certificate there is jotted a note, in James Dean's handwriting, to the effect that he was at liberty to take up his citizenship or no. James Dean also filed with the Secretary of State of New York, on February 5, 1836, an oath of his intention always to reside in the United States, and to become a citizen thereof as soon as he could be naturalized. That is all the positive proof that has been adduced. It has been shown that the naturalization records of the Marine Court are in an incomplete and chaotic condition. It may be conceded that no presumption that the naturalization was not completed arises from the fact that no record of the taking out of final papers is to be found among the records of that tribunal, or from the fact that the first papers remained in the possession of James Dean and Elizabeth Dean. It has been shown that it was not the practice in the Marine Court, as it was, for example, in the federal court in the city of New York, to require the surrender of the first papers, and file or annex them as a part of the record of the proceedings upon issuing the final papers. But the burden of establishing naturalization is on the plaintiff, and it is not sufficient to support it by merely negative presumptions. Counsel for plaintiff seek to establish an affirmative presumption by certain other evidence, such as the affidavit of one John Burton Mayes, attached to the deposition of Andrew Wood in the commission issued to England in the probate proceedings of the Elizabeth Dean will in New York county, wherein the deponent states, as of his own knowledge, that James Dean took up his citizenship in the United States, as well as that Elizabeth Dean was domiciled in the United States at her death. I cannot see that such statements have any probative force whatever. They amount simply to an opinion on questions of law. Reliance is also placed upon the circumstances that James Dean assumed to make leases and perform other acts with regard to real estate he had purchased, which legally might only be

performed by a citizen. The case of Fay v. Taylor, 31 Misc. Rep. 32, 63 N. Y. Supp. 572, is cited, but there was proof that the person in question had voted and had held a liquor tax certificate. In order to be eligible for these privileges, one would have been obliged to produce satisfactory evidence of his citizenship to public authorities. It is not illegitimate to indulge in an affirmative presumption when it is supported by facts of such unequivocal affirmative significance. The presumption is not similarly raised merely by showing that a person on his own responsibility assumed to perform acts for the legality of which citizenship would be requisite, but which, as matter of fact, never were submitted to any legal test. I conclude that the fact of James Dean's citizenship is not established, and therefore the claim of citizenship of Elizabeth Dean fails.

Plaintiff, however, contends that, irrespective of the question of citizenship, Elizabeth Dean, if an alien, was at least a resident alien. The facts are that she was born in England, and lived there until her marriage in London, in 1839, to James Dean; that she accompanied him to the United States, and lived with him in the state of New York as his wife until his death, in 1843; that later, in 1843, taking with her the two children of the marriage, she returned to England, and never again came to the United States; that she remained in England during the balance of her life—more than half a century—except during three visits to Switzerland, in which latter country she was at the time of her death. During the four years while Mrs. Dean lived with her husband in New York, she was undoubtedly a resident of New York, and it would seem equally clear that upon her return to England she ceased to be a resident of New York and of the United States. It is true that the doctrine of reverter of domicile of origin is not administered as strictly by the American courts as it has been by the courts of England. Nevertheless such doctrine is recognized here. In Jacobs on Domicile, §§ 119, 120, it is said: "As evidence of intention, fewer circumstances are required to show the resumption of domicile of origin than to show the acquisition of a new domicile. This rests upon the general presumption of attachment which usually, though not universally, exists toward one's domicile of origin. Says Shaw, C. J., in Otis v. Boston, 12 Cush. 44–50: 'It is said that one's domicile of origin is more easily regained than any other. This is only one of those modes of approximating to the proof of fact and intent which constitute a change of domicile in a doubtful case, because, from the natural propensities of the human mind, one will more readily be presumed to intend returning to his earliest home than to a place of temporary abode. It is but a slight circumstance, but resorted to in a nicely balanced case, where slight circumstances would turn the scale.' The principle is, however, a relative one, and not applicable with the same force to all cases. If domicile of origin corresponds with the place of birth and education, with allegiance and the ties of family relationship, etc., it is obviously more probable, under a given state of facts, that a resumption of such domicile is intended, than if there exists nothing but the bald fiction of domicile of origin to connect the person with the place to which the change is alleged. Indeed, it is not the mere fact of domicile of origin which is of itself of value in determining intention, but the facts which usually attend domicile of origin." In the present case, we have the undoubted fact that Mrs. Dean actually did return to her domicile of origin, and remained there during the greater portion of a long life. There also existed the circumstances of place of birth, education, and family ties, which, according to the language above quoted, characterize the act of returning as involving an intention to resume domicile. Indeed, it would be difficult to imagine any case in which the conceded facts—outside of certain declarations, and the circumstance that Mrs. Dean owned real estate in the United States—more cogently pointed to a resumption of domicile of origin.

Plaintiff, however, has introduced evidence of certain declarations, some of them written and some oral. With regard to the general force of declarations, the following language from Jacobs on Domicile, § 455, is pertinent: "The declarations of the person whose domicile is sought to be fixed are certainly not conclusive upon the question of his intention, but with respect to the weight which is to be given them it is difficult to lay down any rule.

Acts are regarded as more important than declarations, and written declarations are usually more reliable than oral ones. The value of declarations depends upon a variety of considerations, and must be determined in each case by its own circumstances." As the learned author remarks, acts are more important than declarations, and, in my judgment, the written declarations, taken as a whole, do not modify the force of the facts of Mrs. Dean's return to her domicile of origin, and her long-continued residence there for the last fifty years of her life. In an affidavit verified by Elizabeth Dean in January, 1889, which was to be used in procuring a loan upon real estate in New York, she is described as "temporarily residing at Fairmount, Clive Vale, Hastings, Sussex, England." This is merely a preliminary recital of description of the person. The affiant does not say that she is a resident of New York, but merely that her husband died a resident of New York. As far as any force is to be given to the phrase "temporarily residing," it might be taken to mean temporarily residing at Fairmount, instead of some other place in England. There were also offered certain deeds and mortgages made by Elizabeth Dean. In some of them she is described—again in the preliminary descriptio personæ—as "of the city, county, and state of New York, temporarily residing at Fairmount, Clive Vale, Hastings, in the county of Sussex, England." In one she is described as "at present residing in England." These, as already shown, are mere recitals in instruments prepared by New York attorneys for the transfer of New York real estate. Taken collectively, they evince looseness of statement, and probably uncertainty of knowledge and practical disregard of Mrs. Dean's actual residence. In the will and codicils the testatrix is described, respectively, as of "Fairmount, Hastings, in the county of Sussex," as "late of Fairmount, Hastings, in the county of Sussex, but now of Glenthorne, Epsom, in the county of Surrey," and "as of Epsom, in the county of Surrey." No categorical assertion in writing has been produced that she is, or considers herself a resident of New York. Recitals of residence in the will and codicils would seem to be entitled to somewhat greater probative significance than those in the instruments prepared in New York, because the will and codicils were drawn by solicitors with whom the testatrix came personally in contact, and were intended to have a general dispositive force, not to apply merely to specific pieces of property situated in a particular place. I conclude that the written declarations, taken as a whole, and considering the circumstances under which they were respectively executed, if anything, tend to uphold the theory of English, rather than of American, domicile.

There is also proof of an oral declaration made by Mrs. Dean which still more strongly confirms the theory of resumption of domicile of birth. Mrs. Piper testifies that in an interview with the testatrix, about nine years ago, in the latter's house at Epsom, England, "she said she would rather come back here than live in any other country, if it were not for the fear of crossing the ocean. It was the fear of crossing the ocean that kept her from coming." This witness also testifies that the sympathies of the testatrix were very much with this country; that she gave land to the church in this country, because her sympathies were such; that she was known as the "American Lady" in Hastings, England, because of her preference for this country. The witness further says: "I know she spoke as though she preferred to be thought an American." The testatrix's fear of the ocean voyage is so clearly brought out as to carry conviction that, in spite of her wish to return, she never intended to return to this country. Under the circumstances, I do not see how her sentimental interest and "preference" and "sympathies" can be given the force of "allegiance" to the United States or New York, as it is not shown that she had been naturalized.

We have, therefore, the elements of actual resumption of domicile of origin, long residence therein, and lack of intention to return to an acquired domicile at which the testatrix had resided during only four years in comparative youth. It is conceded by counsel for all parties that the word "residence," as used in the statute under which plaintiff claims, is synonymous with "inhabitancy" or "domicile." Roosevelt v. Kellogg, 20 Johns. 208; De Meli v. De Meli, 120 N. Y. 485–491, 24 N. E. 996, 17 Am. St. Rep. 652. And I am

clearly of opinion that Elizabeth Dean was at the time of her death a non-resident alien domiciled in England.

Counsel for plaintiff have cited the case of Dupūy v. Wurtz, 53 N. Y. 556, and have furnished me with the appeal book in that case. It will be unnecessary to recite at length the facts under which the referee there found the testatrix, whose status was involved, to have been a continuing resident of America in spite of long absence abroad. The two cases are not parallel on the facts. Indeed, in many respects the case at bar offers just the converse of the situation presented in the Wurtz Case. In the Wurtz Case the rule is reiterated that the question of domicile is always one of fact, to be determined according to the particular circumstances of each case.

Elizabeth Dean having died a nonresident alien, the statute relied upon by plaintiff (section 4, c. 115, p. 95, Laws 1845, as amended by chapter 261, p. 317, Laws 1874, and chapter 38, p. 32, Laws 1875) does not apply; and it follows that any real estate of which she was seised in the state of New York escheated directly, by operation of law, and without the necessity of any proceedings, upon her death. 2 Kent's Com. p. 54; Mooers v. White, 6 Johns. Ch. 360; Matter of McGraw, 111 N. Y. 66, 19 N. E. 233, 2 L. R. A. 387; Goodrich v. Russell, 42 N. Y. 177. The acquisition of title by Elizabeth Dean through devise from her native-born children, and the passing of title from her, are covered by the rules expressed in the syllabus of Mooers v. White, supra, that "though an alien may take by purchase or devise, and hold until office found, yet on his death the land will escheat to the people without any inquest of office." This being the situation, the Legislature enacted chapter 182, p. 342, of the Laws of 1894, entitled "An act in relation to the estate of Elizabeth Dean, deceased," which provides as follows:

"Section 1. All the right, title and interest which the people of the state of New York have acquired by escheat of, in and to the property in the state, real, personal and mixed, which belonged to or was possessed by Elizabeth Dean, late of Fairmount, Hastings, in the county of Sussex, England, widow, or her late husband, James Dean, or her late son, Frank Dean, or her late daughter, Alice Dean, at the time of decease, hereby is released to, and vested in and confirmed in, the trustees named in and appointed by the last will and testament of the said Elizabeth Dean, executed on the 9th day of May, in the year 1891, and in those of said trustees who shall qualify, and in the devisees, annuitants and beneficiaries named in the said last will and testament, according to the intent of the said testatrix, as therein expressed upon and for, and expressly charged with the trusts in the said will declared, which said trusts hereby are made and declared to be valid and effectual.

"Sec. 2. This act shall take effect immediately."

The validity of this statute is attacked upon various grounds, but none of them, in my judgment, is tenable. As the right of the state becomes absolute through the mere fact of the death of a nonresident alien, there was no interference with vested rights of heirs, or persons answering the description of heirs, of Elizabeth Dean, to render the statute unconstitutional.

Attention is called to the fact that the provisions of the will are contrary to the general rule limiting the right to suspend the power of alienation of property. But that rule is not laid down in the Constitution, but is merely statutory, and may be overridden as to a particular case by the same power that framed the general provision. As I read the will and codicils, they do not offend against the common-law rule upon the subject, which permitted the suspension of the power of alienation for any number of lives in being at the time of the death of the testator and twenty-one years afterwards, and, even if the Legislature went further than would have been sanctioned by the policy of the common law, I do not see why its power in this respect is not plenary. It has been urged that there will be considerable practical difficulty in the administration of the trusts created by the will. Very probably such is the fact, but obviously it offers no ground for overriding the provisions of a positive statute.

This is an action for partition, and, considering the complaint alone, the result would be a dismissal. Counsel for the trustees, however, have demanded various forms of affirmative relief, and, to that end, served their answers not only upon the plaintiff, but upon other defendants. It is, among

other things, prayed that the will and codicils be proved in this action, and that it be adjudicated that the testamentary provisions and the trusts declared are valid, and that the trustees are seised of the premises described in the complaint for the purposes of the trusts. I understand that the plaintiff and such of the defendants as have maintained the same theory as plaintiff do not insist upon an absolute dismissal of the action in the event of the upholding of the will, and are not averse to the rendering of a report in such form that, if the views above expressed shall ultimately prevail, the judgment to be entered shall constitute a final and effectual adjudication of the rights of the parties. I shall accordingly in my report advise a judgment denying the application for partition, proving the will and codicils, declaring their provisions valid and effectual, and adjudging the property in question to be vested in the trustees for the purposes of the trusts.

Fettretch, Silkman & Seybel, for plaintiff.

Evarts, Choate & Beaman, for defendants Francis Evans and wife.

Stetson, Jennings & Russell, for defendants Bishop of Protestant Episcopal Church in Diocese of New York, and Bishop of Protestant Episcopal Church in Diocese of New Jersey.

John W. Farquhar, for defendants Amsdon and another.

Herbert B. Smith, for defendant Mosses.

Campbell & Hance, for defendants Miriam Pratt and Torrens Pratt.

Edgar Logan and Wm. H. Flitner, for defendants Mayes and others.

J. Rider Cady, for infant defendants.

PER CURIAM. Decree in accordance with report of referee.

---

VAN DOREN v. HOLBROOK, CABOT & DALY CONTRACTING CO.

(Supreme Court, Appellate Term. November 30, 1903.)

1. NEGLIGENCE—QUESTIONS FOR JURY.
   Whether defendant contracting company, in doing certain acts in connection with a municipal work, used reasonable and proper care to prevent injury to plaintiff's business and property, was a question for the jury.

2. SAME.
   Whether defendant contracting company, engaged on work of a public character, in connection with the construction of an underground railroad, was under obligations to build a partition to separate plaintiff's kitchen from an opening made in the front wall of the building occupied by plaintiff, was a question for the jury.

3. SAME—PUBLIC WORK—CONTRACTORS—DUTIES—REASONABLE CARE.
   It was necessary for defendant to adopt every reasonable measure to protect plaintiff's business and property from damage in order to escape liability for injuries caused by the work.

Appeal from City Court of New York, General Term.

Action by Albert Van Doren against the Holbrook, Cabot & Daly Contracting Company. From a judgment for plaintiff, and from an order denying a motion for a new trial, defendant appeals. Affirmed.

Argued before FREEDMAN, P. J., and BISCHOFF and BLANCHARD, JJ.